**HOME INSURANCE COM., & Colonial Companies, Inc., and Colonial Life and Accident Insurance Com., Plaintiffs,**

v.

**HARTFORD FIRE INSURANCE, COMPANY, et al., Defendants.**

**No. CIV.A. 2:99CV1319S.**

United States District Court, M.D. Alabama, Northern Division.

Feb. 1, 2005.

Claude William Gladden, Jr., James S. Witcher, III, Hand Arendall, LLC, James Ross Forman, III, Robert S.W. Given, Burr & Forman LLP, John Wesley Clark, Jr., Clark Dolan Morse Oncale & Hair PC, Birmingham, AL, for Plaintiffs.

Bert S. Nettles, Brennan Collins Ohme, London & Yancey, Birmingham, AL, Judy B. Van Heest, Micheal Stewart Jackson, Beers Anderson Jackson Patty & Van Heest PC, Montgomery, AL, for Defendants.

## MEMORANDUM OPINION AND ORDER

COODY, Chief United States Magistrate Judge.

In this case, Home Insurance Company ("Home") seeks a declaratory judgment against Twin City Fire Insurance Company, Hartford Casualty Insurance Company and Hartford Fire Insurance Company (hereinafter collectively referred to as "the defendants" or "Hartford") regarding coverage in the state court lawsuits styled *Parker White v. Colonial Life & Accident Ins. Co.*, CV–95–2251 (Cir.Ct.Mtgy, Ala.) and *Lucas White v. Colonial Life & Accident Ins. Co.*, CV–97–1182–P (Cir.Ct.Mtgy, Ala.). Home seeks a declaratory judgment and recovery from these defendants for subrogation, unjust enrichment, implied contract for indemnity or common law action for indemnity and reimbursement.

Colonial Companies, Inc. and Colonial Life and Accident Insurance Company (hereinafter collectively "Colonial") earlier were realigned as plaintiffs in this action and seek recovery from the defendants for breach of contract and breach of the duty of good faith and fair dealing as a result of action taken in the underlying *Parker White* state court litigation.[1] Colonial also claims that Hartford failed to defend Colonial in Home's suit against Colonial filed in 1999 and which the parties subsequently settled. In that case, Home sought judgment against Colonial requiring Colonial to reimburse it for money Home paid to settle claims in the Parker White case. In essence, Colonial argues that if Hartford had done what it should have done with respect to the Parker White lawsuit, Home would never have sued Colonial.

The court has jurisdiction of this action pursuant to its diversity jurisdiction. *See* 28 U.S.C. § 1332. Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to the United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.

On October 19, 2004, the court entered an order granting the defendants leave to file the pending motion for summary judgment. (Doc. # 159). The defendants filed their motion for summary judgment and supporting brief on November 2, 2004. (Doc. # 160). The plaintiffs have thoroughly responded to the motion for summary judgment, and the court has heard oral argument on the motion. For the reasons that follow, the court concludes that the defendants' motion for summary judgment should be granted and the case dismissed with prejudice.

---

1. Although Colonial asserted a negligence claim as count three in their original cross-claim and third party complaint, the negligence claim was not included in the original pretrial order. Accordingly, the court concludes that Colonial has abandoned its negligence claim. FED. R. CIV. P. 16(e). *See also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir.2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned). *Cf. McMaster v. United States*, 177 F.3d 936, 940–41 (11th Cir.1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir.1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment.")

## I. THE SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c) summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[2] The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324, 106 S.Ct. 2548. If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir.1993); *see also* FED. R. CIV. P. 56(e). ("When a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response . . . must set forth specific facts showing that there is a genuine issue for trial."). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir.1997); *Harris v. Ostrout*, 65 F.3d 912 (11th Cir.1995). However, if there is a conflict in the evidence, "the [plaintiff's] evidence is to be believed and all reasonable inferences must be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir.2000). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary

---

**2.** In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the court stated:

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial . . . We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) except the mere pleadings themselves . . ."

*Id.* at 324, 106 S.Ct. 2548.

judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law FED. R. CIV. P. 56(c). With these principles of law in mind, the court will determine now whether summary judgment is appropriate and should be granted.

## II. FACTS

**A. The Parker White Lawsuit.** Viewed in the light most favorable to the plaintiffs and drawing all reasonable inferences in their favor, the following facts are treated as undisputed for the purposes of summary judgment. Home insured Colonial under four commercial general liability policies from January 1, 1990 until January 1, 1994. Home also insured Colonial under umbrella policies during this time period. Twin City, a subsidiary of Hartford, undertook to insure Colonial under commercial general liability policies beginning on January 1, 1994, and continuing until January 1, 1997. Hartford also issued umbrella policies to Colonial for the period of January 1, 1994 until May 1, 1995.

On October 19, 1995, Parker White filed a lawsuit in state court against Colonial and other defendants, alleging breach of contract, fraud, and the tort of outrage. *See Parker White v. Colonial Life & Accident Ins. Co.*, CV–95–2251 (Cir.Ct.Mtgy, Ala.). According to Parker White, his claims arose out of his employment relationship with Colonial. Parker White had worked for Colonial for many years when, in March 1991, Colonial terminated his contract as marketing director and demoted him to sales agent. In December 1991, after many discussions and lengthy negotiations, Parker White agreed to continue his employment with Colonial as a sales agent, provided that Colonial permanently assign 174 accounts to him.[3]

In 1992, Parker White began experiencing health problems including angina and depression.[4] In February 1994, Colonial began reassigning the 174 accounts to other agents. In August 1994, Parker White was complaining to his physician about depression, fatigue, and partial impotence, all of which he attributed to Colonial's reassignment of accounts away from him. (Pls' Evid. Submission, Vol. 1, Ex. J, Attach. 38). In October 1995, Parker White filed his action in state court alleging that Colonial's reassignment of the accounts constituted fraud as well as a breach of its agreement to permanently assign the accounts to him. Parker White sought compensatory and punitive damages.

Colonial timely notified Home and Hartford of Parker White's lawsuit. Hartford retained counsel for Colonial under a reservation of rights. In addition, the defendants contacted Home and requested that Home share the cost of defending Colonial. Home agreed to share defense expenses, also under a reservation of rights. The Parker White action was set for trial on January 5, 1998.

In November 1997, trial counsel for Colonial submitted to the insurance companies a pretrial report detailing Parker White's claims for damages and opined that Colonial had only a "50/50" chance of

---

**3.** There is a dispute about whether Parker White was told that the 174 accounts would be permanently assigned to him. Colonial contends that the accounts were only assigned to White for one year and that Parker White knew the assignments were not permanent. What actually happened as well as resolution of this dispute is not material to the issues presently before the court.

**4.** There is some evidence that Parker White was also drinking heavily at this time. On one medical form, White indicated that he was drinking whiskey every weekend, three to four beers every day, and wine with his evening meals. (Pls' Evid. Submission, Vol. 1, Ex. J, Attach. 38)

a defense verdict. In December 1997, Parker White made a settlement demand to all defendants in the underlying lawsuit. The case was ultimately settled by Home agreeing to pay Parker White two million dollars, and by Colonial agreeing to certain renewal commissions on specific accounts at an estimated total cost of $355,000 to $400,000 dollars. Hartford did not contribute to the settlement. Rather, Hartford withdrew its settlement offer contribution of $250,000 after Home refused to waive it rights to seek reimbursement.

On November 4, 1999, Home filed this action against the defendants seeking to recover the two million dollars Home paid to settle the Parker White litigation and a declaration that Hartford's policies instead of Home's policies covered that lawsuit. Home's claims sound in equity and state law. Home also sought recovery from Colonial for a portion of the settlement amount not covered by Home's policies. As earlier noted, Colonial and Home subsequently settled Home's claims against Colonial by Colonial assigning its interest in any proceeds in this case to Home.

**B. The Lucas White Lawsuit.** Lucas White, Parker White's son, filed suit against Colonial in June 1997 in state court. *See Lucas White v. Colonial Life & Accident Ins. Co.*, CV–97–1182–P (Cir.Ct. Mtgy, Ala.). Lucas White alleged that Colonial breached his lifetime employment contract by firing him and restructuring his work environment. The Lucas White lawsuit was ultimately settled in April 2000 for $1.1 million dollars. Twin City did not contribute financially to the settlement. Prior to Home filing the instant action about the underlying Parker White litigation, Twin City filed a declaratory judgment action in this court on August 27, 1999, seeking a declaration that it had neither a duty to defend nor a duty to indemnify Colonial in the Lucas White litigation. *See Twin City Fire Ins. Co. v. Colonial Life & Acc. Ins. Co.*, 99–D–935–N (M.D. Ala.).

On May 17, 2000, Colonial filed a counterclaim in Twin City's declaratory judgment action alleging that Twin City had acted in bad faith during settlement negotiations in the underlying litigation by failing to contribute to and abandoning Colonial during the negotiations. Colonial sought damages from Twin City for its failure to contribute to the Lucas White settlement. After a bench trial, the court determined that Twin City's policies did not provide coverage to Colonial for Lucas White's claims. *See Twin City Fire Ins. Co. v. Colonial Life & Acc. Ins. Co.*, 99–D–935–N (M.D.Ala.) (doc. # 113, June 25, 2003). Nonetheless, the court concluded that Twin City had acted in bad faith when it initially agreed to contribute to the settlement and then, at the eleventh hour, withdrew financial support. (*Id.*)

Twin City appealed the court's determination that it had acted in bad faith. Colonial did not appeal the court's determination that the policies at issue did not cover the underlying action. On appeal, the Eleventh Circuit held that the trial court erred in awarding compensatory and punitive damages to Colonial. Relying on the determination that there was no coverage available to Colonial under the policies, the appellate court held that Colonial had failed to demonstrate that it was damaged by Twin City's actions because "had Twin City contributed to the settlement, it could have been reimbursed by Colonial for that contribution." *Twin City Fire Ins. Co. v. Colonial Life & Acc. Ins. Co.*, 375 F.3d 1097, 1100 (11th Cir.2004). In addition, the Court held that Twin City did not act in bad faith for refusing to contribute to the settlement because the claims were not covered by its policies. *Id.* at 1103.

## III. DISCUSSION

### A. Home's Equitable Claims against Twin City, Hartford & Hartford Fire regarding the *Lucas White* settlement.

Home seeks recovery from the defendants under equitable and legal theories including claims for subrogation, unjust enrichment, implied contract for indemnity, common law action for indemnity and reimbursement. Home asserts that the Eleventh Circuit's decision in *Twin City Fire Ins. Co., supra,* does not adversely impact its equitable claims related to the underlying Lucas White case against the defendants. Resolution of these equitable, unjust enrichment claims is controlled by Alabama law. Relying on *Guaranty Trust Co. of N.Y. v. York,* 326 U.S. 99, 112, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), the court has previously decided that because Home's claims sound in equity, they are governed by the laws of the forum state. (Doc. # 116, Feb. 13, 2003). This conclusion was not challenged on appeal. *See* Doc. # 131.

■ "One is unjustly enriched if his retention of a benefit would be unjust." *Jordan v. Mitchell,* 705 So.2d 453, 458 (Ala. Civ.App.1997) (citing Restatement of Restitution: Quasi Contracts and Constructive Trusts § 1, Comment c. (1937)). The *Jordan* court explained:

> "Retention of a benefit is unjust if (1) the donor of the benefit [here, allegedly Dr. Welch] . . . acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit [here, allegedly MEP] . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient

may have been enriched, but he is not deemed to have been unjustly enriched." 705 So.2d at 458, cited with approval in *Welch v. Montgomery Eye Physicians,* 891 So.2d 837, 843 (Ala.2004).

Notwithstanding the district court's decision in *Twin City Fire Ins. Co., supra,* Home suggests that there has not been a definitive determination about whether the defendants' insurance policies cover Lucas White's claims. Home argues that although the *Twin City* court concluded that the defendants' policies did not provide coverage for Colonial against Lucas White's claims, that determination was not appealed to the Eleventh Circuit.[5] The court will independently consider whether Lucas White's claims were covered under the defendants' insurance policies.

■ The insurance policies at issue provided coverage for claims of "bodily injury." The policies define "bodily injury" as "bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time." (*Twin City Fire Ins. Co., v. Colonial Life & Acc. Ins. Co.,* 99–D–935–N (M.D.Ala.), Joint Tr. Ex. Vol. I, Exs. 3–5., Sec. V, ¶ 3, p. 9, doc. # 95).[6] The endorsements to the policies modified the definition to "[b]odily injury" means bodily injury, sickness or disease sustained by a person, including mental anguish or death resulting from any of these. (*Id.* at Endorsement, ¶ 17, p. 4.)

A careful review of the complaint in the Lucas White lawsuit demonstrates that Lucas White's claims for damages were based exclusively on mental anguish which was unrelated to any claim of bodily injury. (*Twin City Fire Ins. Co., v. Colonial Life & Acc. Ins. Co.,* 99–D–935–N

---

5. In fact, it appears that the Eleventh Circuit actually accepted the district court's determination regarding coverage under the policies. *See Twin City,* 375 F.3d at 1098.

6. The parties have stipulated to the admissibility of evidence and stipulations entered in the *Lucas White* in this case. *See* Doc. # 112.

(M.D.Ala.), Joint Tr. Ex. Vol. I, Ex. 1, ¶ 21)

> As a proximate consequence of all Defendants' refusal to honor the contractual obligations of the agreement, Plaintiff was injured and damaged as follows: he has lost renewals, commissions, and income; he has suffered mental anguish and emotional distress and will continue to do so.

An amended and substituted complaint alleges "great mental distress, anguish, pain and suffering." (*Id*, at Joint Tr. Ex. Vol. I, Ex 2, ¶ 27, p. 5). Nowhere in the complaint does Lucas White allege any bodily injury, sickness or disease other than his emotional injuries.[7] While "South Carolina law generally recognizes that emotional trauma may constitute bodily injury for purposes of determining insurance coverage," South Carolina also requires that some physical manifestation of that injury be alleged in the complaint. *Jefferson–Pilot Fire & Cas. Co. v. Sunbelt Beer Distrib., Inc.*, 839 F.Supp. 376, 379 (D.S.C. 1993).

It is abundantly clear that the defendants' policies provide coverage for mental anguish only if the mental anguish results from bodily injury, sickness or disease. Lucas White's claims of mental anguish are wholly unrelated to any "bodily injury, sickness or disease." In addition, in response to the defendants' motion for summary judgment, the plaintiffs have come forward with no evidence of a disputed issue of material fact that Lucas White suffered a bodily injury, sickness or disease or that his emotional angst resulted from them. Consequently, Home is simply wrong when it asserts that White's claims were covered under the policies of insurance. Because there was no coverage under the polices, the court concludes as a matter of law, the defendants owed Colonial no duty to participate in or contribute to the settlement of Lucas White's claims. *Cf. Twin City Fire Ins. Co., supra.*

Furthermore, the defendants owed no duty to Colonial to indemnify it for any portion of the settlement. Because the defendants owed Colonial no duty to indemnify, Home's equitable claims must fail. These equitable claims are dependent on the defendants' legal obligation to Colonial under the policies of insurance. Because the defendants had no legal obligation to Colonial under the policies, it follows that Home has now no basis of recovery against Hartford.

Home argues, however, that because the defendants did not know that Lucas White had suffered no physical injury at the time Home settled Lucas White's case, the defendants remained exposed and had a duty to defend. According to Home, the defendants were unjustly enriched because as a result of Home's settlement of Lucas White's lawsuit, Hartford had no further expenditure of defense fees and expenses. Home argues that it would be unfair for Home not to be compensated by Hartford simply because three years later, there was a determination that Hartford had no coverage. At oral argument, Home agreed that Hartford paid its share of defense costs up to the time of settlement. Home argues that Hartford was unjustly enriched because Hartford did not have to continue to pay defense costs, even though it did not contribute to the settlement. Counsel for Home stated, "[t]he damage is that Hartford should have paid for part of the settlement." This tautology supports the conclusion that what Home is seeking is reimbursement for its indemnification of Colonial on the Lucas White claim which, for the reasons as stated, the contracts of insurance do not require. Accordingly,

---

7. While "pain and suffering" is alleged, it is not in any way connected to "bodily injury, sickness or disease." The court will not infer such a connection under these circumstances.

the defendants' motion for summary judgment on Home's claims based on the Lucas White litigation is due to be granted.[8]

### B. Colonial's Claims regarding the defense of Home's lawsuit.

Hartford seeks summary judgment on Colonial's claim that Hartford failed to defend Colonial in Home's suit against Colonial filed in 1999 well after Hartford's policies provided coverage. Colonial's response to all of this is that if Hartford had done what it should have done with respect to the Parker White lawsuit, Home would never have sued Colonial. At oral argument, Colonial virtually admitted that this claim is less a proper cause of action than a component of its damages claim against Hartford. The court agrees.

Hartford also argues that because there was no contract between Colonial and Hartford in 1999 when Home sued Colonial, Hartford had no duty to defend Colonial. Colonial argues that the court should look to 1997, when the damage occurred, to determine whether there was a valid contract of insurance. The court pretermits discussion of this timing argument because Hartford's general commercial liability policies plainly exclude contractual claims. See Pls.' Evid. Sub., Vol. II., Ex. 1, Section I. 1. Coverage under this section is for bodily injury and property damage caused by an "occurrence" which the policy defines as an "accident."[9] Home's lawsuit sought reimbursement from Colonial on

---

**8.** There is potentially an alternative basis for resolution of these claims. Hartford raised this contention in its pretrial brief, and while the court does not rely on it because the parties have not fully briefed the issue, the court will set forth the analysis. Arguably, as a matter of Alabama law, Home cannot recover its voluntary payment to the Lucas White settlement.

> It has been the law in Alabama for over 150 years that where one party, with full knowledge of all the facts, voluntarily pays money to satisfy the colorable legal demand of another, no action will lie to recover such a voluntary payment, in the absence of fraud, duress, or extortion.

*Mt. Airy Ins. Co. v. Doe Law Firm*, 668 So.2d 534, 537 (Ala.1995); *U-Haul Co. of Ala. v. Johnson*, 893 So.2d 307, 311 (Ala.2004); *Stone v. Mellon Mortgage Co.*, 771 So.2d 451, 456 (Ala.2000). *See also Allstate Ins. Co. v. Amerisure Ins. Cos.*, 603 So.2d 961 (Ala.1992). The plaintiffs contend that their contributions to the settlements were not voluntary because Hartford forced them to pay on the eve of trial. Their positions are untenable. "Alabama law recognizes that the mere threat of legal proceedings is insufficient to constitute the duress needed to make the payment of money involuntary." *Mt. Airy*, 668 So.2d at 538. In *Mt. Airy*, the insurer paid to settle a potential malpractice claim against the insured and then sought reimbursement from the insured for the amount paid to settle the claim. Although the insurer gave notice to the insured that it would seek to recover the money, the court held that "such a protest

by itself was insufficient to make the payment 'involuntary.'" *Id.* Because the court concluded that the payment to settle the claim was voluntary, the insurer was not entitled to seek reimbursement. *Id.* at 539. At oral argument, Home agreed that Hartford paid its share of defense costs up to the time of settlement. Home argues that nonetheless Hartford was unjustly enriched because Hartford did not have to continue to pay defense costs, even though it did not contribute to the settlement. Counsel for Home states, "[t]he damage is that Hartford should have paid for part of the settlement." This argument, of course, merely supports the conclusion that Home is seeking reimbursement for its contribution to the White settlements for which, under Alabama law, it is not entitled.

> Claims based on theories of breach of contract, unjust enrichment, and money had and received are precluded by proof that the plaintiff voluntarily paid what he or she is seeking to recover.

*Stone*, 771 So.2d at 456. As the court concludes elsewhere in this opinion, Hartford's policy provided no coverage for the White claims. Thus, Home's payment on the White claims will not support any equitable action against Hartford on contributions made by Home. Accordingly, the defendants' motion for summary judgment on Home's equitable claims is due to be granted.

**9.** As explained elsewhere at length in this opinion, an "accident" does not encompass an intentional act. A denial of coverage is obviously an intentional act.

the basis that Home's insurance policies did not and Hartford's policies did cover Parker White's claims. This claim is a quintessential contract dispute which under any circumstances is not an "accident." Consequently, Hartford owed Colonial no defense or indemnification. Accordingly, summary judgment is due to be granted on this claim.

Finally, the court notes that with respect to whether this is properly a damage issue, it is purely speculative to suggest that Home would not have sued Colonial for any contribution it might have made to settle the Parker White suit. Thus, it is doubtful that the amount of Home's contribution to settlement would have made a difference in the cost of the defense of Home's suit against Colonial. However, the question of damages as related to Colonial's claim against Hartford is not presently before the court and the court declines to address it further at this time.

**C. Colonial's Claims Regarding Hartford's Failure to Contribute to the Parker White Settlement.** The court now addresses the heart of this matter. Hartford contends that its insurance policies provide no coverage for Parker White's claims because the claims arose prior to applicable coverage periods and his claims did not constitute an occurrence as defined by the policies. Furthermore, Hartford says that even if the court were to assume that Parker White's claims constituted an occurrence under the policies, the policies still provide Colonial with no coverage because White's damages were the expected or intended consequences of Colonial's actions. Colonial contends to the contrary as follows:

Hartford CGL policy only excludes "bodily injury" or "property damage"

"expected or intended from the standpoint of the insured." Ex. 1, p. 1 of 12, Section I Coverage A.2.a. Thus, if Colonial did not intend to cause Parker White bodily injury, and there is no evidence that it did, then the depression and emotional distress which White suffered from Colonial's alleged innocent and reckless fraud would be covered by Hartford's CGL and umbrella policies. Hartford has pointed to no evidence which shows that Colonial intended to cause White "bodily injury" or "personal injury."

(Colonial's Br. in Opp. to Defs' Mot. for Summ. J. at 24.)

Hartford's insurance policies provide that it "will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damages" to which this insurance applies." (Pls' Evid. Sub., Vol. II., Ex. 1, Section I., ¶ 1a.). The policies further provide that "this insurance applies to "bodily injury" and "property damages" only if: (1)[t]he "bodily injury" or "property damages" is caused by an "occurrence" that takes place in the "coverage territory;" and (2)[t]he "bodily injury" or "property damages" occurs during the policy period." (*Id.* at ¶ 1.b.). Finally, the policies contain an intentional act exclusion. "This insurance does not apply to . . . "[b]odily injury" or "property damage" expected or intended from the standpoint of the insured." (*Id.* at ¶ 2.a.) It is the construction and application of this latter provision which is determinative of Hartford's motion for summary judgment.

Resolution of the intentional act issue requires the court to wade into what Justice Cardoza rightly characterized as a Miltonian Serbonian Bog.[10] *See Landress*

---

10. This reference is from John Milton's *Paradise Lost*, Book II, lines 587–95:

Beyond this flood a frozen Continent

Lies dark and wilde, beat with perpetual storms
Of Whirlwind and dire Hail, which on firm land

*v. Phoenix Mut. Life Ins. Co.*, 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934 (1934) (Cardoza, J. dissenting) ("The attempted distinction between accidental results and accidental means will plunge this branch of the law into a Serbonian Bog."). To determine whether Hartford's policies offer Colonial any coverage for Parker White's claims, the court will look at the entire bog, examining all evidence, including the complaint, in the underlying suit.[11] *Baker v. Am. Ins. Co. of Newark*, 324 F.2d 748, 750 (4th Cir.1963).

 The starting point for the court's journey through the bog is the language of the policies. The law is clear that in South Carolina, provisions of insurance policies are to be liberally construed in favor of the insured. *See State Farm Fire & Cas. Co. v. Barrett*, 340 S.C. 1, 530 S.E.2d 132, 135 (2000). However, "courts are not permitted to torture the ordinary meaning of language to extend coverage expressly excluded by the terms of the policy." *Sphere Drake Ins. Co. v. Litchfield*, 313 S.C. 471, 438 S.E.2d 275, 277 (1993). *See also Torrington Co. v. Aetna Casualty & Surety Co.*, 264 S.C. 636, 216 S.E.2d 547 (1975).

 The policies define an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[12] (Pls' Evid. Sub., Vol. II., Ex. 1, Section V, ¶ 9.) However, the policies do not define the term "accident." Consequently, "[w]hen a policy does not specifically define a term, the term should be defined according to the usual understanding of the term's significance to the ordinary person." *Barrett*, 530 S.E.2d at 136; *Manufacturers & Merchants Mut. Ins. Co. v. Harvey*, 330 S.C. 152, 498 S.E.2d 222, 225 (1998); *USAA Property & Cas. Ins. Co. v. Rowland*, 312 S.C. 536, 435 S.E.2d 879, 881–82 (1993).

In *Stevenson v. Connecticut Gen. Life Ins. Co.*, 265 S.C. 348, 218 S.E.2d 427, 429 (1975), the court noted the importance of *Goethe v. New York Life Ins. Co.*, 183 S.C. 199, 190 S.E. 451 (1937). "The case of *Goethe* ... is still the leading and controlling decision of this Court as to what constitutes an 'accident' within the purview of an insurance policy." In *Goethe*, the South Carolina Supreme Court concluded that

> when injury or death follows or results from a voluntary act of the insured, and the act is one which is not manifestly dangerous, but which is ordinarily done or performed without serious consequences to the doer, such result is caused by accidental means.... An ef-

---

> Thaws not, but gathers heap, and ruin seems
> Of ancient pile; all else deep snow and ice,
> A gulf profound as that Serbonian Bog
> Betwixt Damiata and mount Casius old,
> Where Armies whole have sunk: the parching Air
> Burns frore, and cold performs th' effect of Fire.

*See* Parker B. Potter, Jr., *Surveying the Serbonian Bog: A Brief History of a Judicial Metaphor*, 28 TUL. MAR. L.J. 519 (2004) for more detailed and thorough analysis of the quotation including other judicial references to Justice Cardoza's metaphor.

11. The parties agree that to determine whether Hartford had a duty to defend Colonial against Parker White's claims, the court looks to the allegations in the complaint against the insured to determine whether facts have been alleged which would provide the insured coverage under the policies. *See R.A. Earnhardt Textile Mach. Div. v. South Carolina Ins. Co.*, 277 S.C. 88, 282 S.E.2d 856, 857 (1981); *Jefferson–Pilot Fire & Cas. Co. v. Sunbelt Beer Distrib., Inc.*, 839 F.Supp. 376, 378 (D.S.C. 1993). However, it is undisputed that Hartford did undertake to defend Colonial from notice until the underlying lawsuit settled.

12. Although Home argues that the definition of accident includes *either* an accident *or* a continuous or repeated exposure to substantially the same general harmful conditions, there is absolutely no support in the policy for that argument.

fect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, and effect which the actor did not intend to produce and * * * cannot be charged with the design of producing, * * * is produced by accidental means.

*Goethe,* 190 S.E. at 458 (internal citation omitted)

In expanding on and applying *Goethe's* analysis, the South Carolina courts continue to focus on the ordinary and usual meaning of the word "accident." *See Stevenson,* 218 S.E.2d at 429; *Garrett,* 128 S.E.2d at 174; *Green v. United Ins. Co. of Am.,* 254 S.C. 202, 174 S.E.2d 400, 402 (1970). Thus, the South Carolina Supreme Court has declined to adopt a "reasonably foreseeable" analysis, *see Stevenson,* 218 S.E.2d at 430, but rather, has espoused a quite simple, but by no means all inclusive, definition of the word 'accident." *Green,* 174 S.E.2d at 402.

An unexpected happening or event, which occurs by chance and usually suddenly, with harmful result, not intended or designed by the person suffering the harm or hurt.

*Id.See also Rowland,* 435 S.E.2d at 882.

■ More plainly stated, under South Carolina law "an intended injury cannot be accidental." *Harvey,* 498 S.E.2d at 225. *See also Barrett,* 530 S.E.2d at 136. It is the "intent to act, coupled with the intent to produce the consequences" that determines whether an accident has caused the resulting injury. *Harvey,* 498 S.E.2d at 227.

At the least, therefore, an insured's act is not an accidental contributing cause of injury when the insured actually intended to cause the injury that results. "[A]n accident is never present when a deliberate act is performed unless some additional unexpected, independent and unforeseen [circumstance exists or] happening occurs which produces or brings about the result of the injury or death." *Id.*

■ The court concludes that, under South Carolina law, an intentional act of fraud cannot be accidental, and thus, as a matter of law, cannot constitute an occurrence under the policies. This conclusion is wholly consistent with *Goethe* because there a voluntary act is accidental only when it is of a nature or character which does not result in harm. Fraud, of course, is not of that character.

■ The court now turns to the allegations and facts in the underlying lawsuit to determine whether Parker White alleged intentional acts against the insured, Colonial. White sought damages for the tort of outrage, fraud, breach of contract and bad faith. (Pls' Evid. Sub., Vol. II., Ex. 3). According to White, he worked for Colonial for many years when, in March 1991, Colonial terminated his contract as marketing director and demoted him to sales agent. After many lengthy negotiations and discussions, Colonial and White agreed in December 1991, that White would continue his employment with Colonial, provided that Colonial permanently assign 174 accounts to him. White contended that Colonial and its agents represented to him that this group of 174 accounts would be permanently coded to him. In consideration of this permanent assignment, White refrained from suing Colonial for wrongful termination of his marketing director's position. In his complaint, White alleged that

[t]he statements made by the Defendants were false and the Defendants knew they were false; or Defendants recklessly made the statements without having true knowledge thereof; or the Defendants made such statements innocently with the *intention that Plaintiff should rely upon them to his detriment* which Plaintiff did; or, Defendants

made such statements as a promise of future action with no present intention to honor or fulfill such promise or Defendants are guilty of common law deceit in that Defendants *intentionally engaged in statements or active conduct intended to induce Plaintiff* to forebear from filing a lawsuit; to cooperate with them in the defense of the Wayne Parker lawsuit, and to continue to write business, and develop employer groups for the Defendants. Such statements were false because, as Plaintiff discovered in February, 1994, Plaintiff's group accounts had been assigned away from him and were being assigned away from him continuously and Defendants were interfering with Plaintiff's servicing of his groups and the production of insurance business from such groups.

(*Id.* at ¶ 29, p. 18) (emphasis added). It is clear and undisputed that, throughout the state court action, White contended that Colonial's actions were intentional.[13] The

facts as presented in the underlying litigation clearly demonstrate that Parker White's claims resulted from Colonial's intentional acts. At the very least, it is undisputed that Parker White presented evidence that Colonial's actions were intentional and designed to cause him emotional distress, stress and anxiety. The plaintiffs have pointed the court to no issues of disputed facts regarding the intentional nature of Colonial's acts in the underlying lawsuit. Because the court concludes that Colonial's acts were intentional and done to harm, by their very nature the acts could not be accidents, and thus could not constitute occurrences as defined in the policies. Accordingly, the court concludes that the plaintiffs have failed to demonstrate that there exists a genuine issue of material fact regarding whether Colonial's acts constituted an occurrence under Hartford's policies, and consequently, Hartford's policies did not cover Parker White's claims.[14] The defendants are entitled to

**13.** For example, during his deposition, Parker White testified that Don Fennell "went after [him] in every way." (Pls' Evid. Sub. Vol. I, Dep. Parker White, Vol. II, p. 218)

> Don Fennell in our very first meeting made it very clear—he liked to make it very clear in front of everybody, not on a one-on-one basis, but that he was not going to abide by any commitments that Colonial had made; he didn't recognize them; that they were going to reassign my groups, even reassign the state groups. he made it very clear that he was entertaining the thought of turning over the state groups to young Frankie Barnes, that he and Joe Thompson had met with Frankie Barnes to discuss this.
>
> Don Fennell, for whatever reason, never—even though 1993, the year before he took over my unit, I produced every unit in his three-state region, and I was the leading producer by far in that three-state—personal producer. Instead of taking me and using my strength, he went after me in every way. It was obvious from the start. He wanted to cut me down to size.
>
> And he began to do it, taking my groups along with Joe Thompson. He also had an

influence on Mr. Thompson's attitude, which had been in most cases cooperative and, you know, where they abided by at least the groups that had been assigned to me up until March of '94, no breach of my—no official breach of it until then. . . .

> I will say this: Mr. Fennell, for whatever reason, uses unrealistic—well, hateful is a poor choice of words. Mean-spirited. He's in control of my accounts. . . .

(*Id.* at 217–219).

**14.** To the extent that the plaintiffs argue that Parker White alleged negligent, reckless or innocent fraud falling within the "accident" "occurrence" coverage of the policy, this argument is unavailing. "While alternative pleading is permitted in South Carolina, parties may not attempt to invoke coverage by couching intentional acts in negligence terms." *Harvey,* 498 S.E.2d at 227. *See also Barrett,* 530 S.E.2d at 137 *quoting Rowland,* 435 S.E.2d at 882 ("in the context of a cause of action alleging an intentional tort, which by definition cannot be committed in a negligent manner, the allegation of negligence is surplusage."). The facts of the underlying fraud claims do not support a conclusion that

summary judgment on this basis. The court will not truncate its analysis at this point, however, because even if Colonial's acts do constitute an occurrence,[15] Hartford argues that coverage does not exist because of the intentional act exclusion.

■ The policies at issue clearly contain an exclusion for " '[b]odily injury' ... expected or intended from the standpoint of the insured." Hartford argues that because Parker White's damages were the expected and intended result of Colonial's actions, the intentional act exclusion applies and Hartford's policies provide Colonial no coverage. *See Snakenberg v. Hartford Cas. Ins. Co., Inc.*, 299 S.C. 164, 383 S.E.2d 2, 4 (1989). The plaintiffs argue, however, that unless Hartford can demonstrate that Colonial specifically intended or expected its actions to cause White alcoholism, impotency, and depression, the intentional act exclusion does not apply. In other words, the issue is whether under South Carolina law this exclusion should be construed in a manner requiring that the specific type of injury suffered by Parker Whiter be expected or intended by Colonial, the insured.[16]

Colonial relies on *State Farm Mut. Automobile Ins. Co. v. Moorer*, 330 S.C. 46, 496 S.E.2d 875 (1998), to assert that "even if an insured intends to commit an *act*, the

event is still an "occurrence," so long as the insured did not intend to cause the *injury* which resulted." (Home's Br. addressing Hartford's Insurance Coverage at p. 7). Colonial's reliance is misplaced. By its terms, *Moorer* is inapposite. As explained in that case, South Carolina has a financial responsibility statute which requires automobile policies to provide coverage even for intentional acts of the insured.

> The principle that one should not be permitted to insure against his own intentional wrongdoing applies to voluntary insurance, not compulsory insurance. Where the Legislature makes coverage compulsory, instead of leaving it to the voluntary market, it has already balanced the public interest in prohibiting insurance for intentionally harmful acts against the public interest in compensating the victims of at fault motorists.

496 S.E.2d at 880.

Next, and perhaps more importantly, the court has been unable to find any support for the proposition that South Carolina defines the term "accident" to include a "specific injury" requirement. In *Vermont Mut. Ins. Co. v. Singleton*, 316 S.C. 5, 446 S.E.2d 417, 419 (1994), the South Carolina Supreme Court adopted a

the acts of Colonial were negligent, reckless or innocent.

**15.** The plaintiffs' argument is that under South Carolina law the term "accident" encompasses both the act and the resulting injury. Therefore, they argue that unless an event is *both* an intentional act with an intended injury, it is accidental and, therefore, an occurrence. In its discussion of the intentional act exclusion, the court addresses the intended injury issue.

**16.** "But, it has been said that 'Indemnification agreements are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for dam-

ages flowing from the intentional causation of injury,' so that indemnification may be permitted when grossly negligent conduct was alleged and found. Decisions with respect to these issues raise difficult policy concerns: On the one hand, the courts are, with good cause, reluctant to encourage wrongdoing by permitting the wrongdoer to be indemnified for his misconduct. On the other hand, a refusal to permit indemnity will often, if not usually, result in an injury being unredressed by compensation. Balancing these competing interests is difficult, and often results in subtle distinctions." Williston on Contracts, § 19:20. Indemnity Against Intentional Wrongs.

two-prong test to determine the applicability of an intentional act exclusion in an insurance policy. The first prong of the test is met because the allegations in and facts of the underlying lawsuit charge Colonial with intentional fraud. The second prong of the test requires "an intentional result." *Id.* at 420. In *Singleton,* the insured struck the victim in self defense. The court held that because the intended result was self-defense and not an eye injury to the victim, the intentional act exclusion did not apply. *Id.* The facts in *Singleton* make it inapposite in this case. It is undisputed that, in the underlying lawsuit, Parker White contended not only that Colonial intended to defraud him, but that, through its actions, intended to cause him harm. Nothing in *Singleton* suggests that intent to create a specific type of harm is required; indeed, *Singleton* spoke only of harm in a generalized context.[17]

In *Harvey, supra,* the court considered whether homeowners insurance policies provided coverage against claims that the insureds sexually abused their grandchildren. The policies at issue defined a covered "occurrence" as "an *accident,* including continuous or repeated exposure to substantially the same general harmful conditions which results, during the policy period, in: (a) bodily injury; or (b) property damage." The policies did not define the term "accident." Emphatically, the court concluded that there was no coverage because "an intended injury cannot be accidental." 498 S.E.2d at 225. Colonial relies on *Harvey,* arguing that

[t]he term "accident" is not specifically defined in the policies, but under South Carolina law an "accident" is anything which causes "an effect which the actor did not intend to produce and cannot be charged with the design of producing."

*Manufacturers and Merchants Mutual Ins. Co. v. Harvey,* 330 S.C. 152, 498 S.E.2d 222, 225 (1998) ... Thus, if Colonial did not intend to cause depression and severe emotional distress or other sickness when it terminated White's Marketing Director Agreement and allegedly breached his Sales Director Agreement, this liability would be covered by the Hartford policies.

(Colonial's Br. in Opp. to Defs' Mot. for Summ. J. at 25.)

As the following quotation from *Harvey* illustrates, Colonial's reading of that case is too narrow.

Appellants argue that the medical testimony submitted at trial states conclusively that pedophiles and Mr. Harvey, in particular, do not intend sexual abuse to be harmful and that, therefore, sexual abuse can constitute an "occurrence."

We today hold that the sexual abuse of a child is so inherently injurious to the victim that the perpetrator's intent to harm the child will be inferred as a matter of law.

498 S.E.2d at 225–226.

As these paragraphs from *Harvey* illustrate, the inquiry of the court was about whether harm was intended, not whether a specific type of harm was intended. Indeed, in concluding that harm will be inferred from sexual abuse, the court did not constrain in any way the nature of the resulting harm which properly is considered intentional. Far from supporting Colonial's position, *Harvey* is properly understood as standing for the proposition that intending harm is sufficient.

This conclusion is supported by *Snakenberg, supra,* in which the court held that

---

17. The court reaches this conclusion in large measure because the cases relied upon by the *Singleton* court, such as *Breland v. Schilling,* 550 So.2d 609 (La.1989) do not restrict the exclusion to harm specifically intended.

for purposes of civil liability, an act is intentional if (1) it is done willingly, and either the (2) actor desires the result of his conduct, whatever the likelihood of that result happening; or (3) the actor knows or ought to know the result will follow from his conduct, whatever his desire may be as to that result.

383 S.E.2d at 6.

In *Snakenberg*, Hartford sought a declaratory judgment that its homeowners policy did not provide coverage because the policy excluded coverage for damages intended or expected. The underlying claim involved a claim of wrongful intrusion into private affairs which occurred when the homeowner surreptitiously videotaped models while they changed into swimsuits for a modeling session. Snakenburg argued that his purpose of his actions was not to violate the models' right to privacy and, therefore, not intentional.

This argument illustrates how intent is often confused with the associated ideas of volition, deliberation, purpose, motive, and malice ... Neither purpose nor motive must be proven to show intent. If the videotaping was an act of volition and the resulting exposure of the girls was the expected or natural consequence of that act, intent has been proven.

383 S.E.2d at 7–8.

Colonial's argument is essentially the same made in *Snakenberg*, and for that reason it likewise must fail. The fact that Colonial did not intend certain, specific consequences is of no consequence to the determination whether harm was intended.

In *General Ins. Co. of Am. v. Palmetto Bank*, 268 S.C. 355, 233 S.E.2d 699 (1977), the policy at issue defined an "occurrence" as property damage "neither expected nor intended from the standpoint of the insured." *Id.* at 701.

The complaints alleged that Home Wholesale intentionally distrained the machines. Assuming, for argument, that the loss of use by Booth was "damage" to the machines, this damage was certainly expected and intended by Home Wholesale it was, in other words, not caused by an "occurrence."

*Id.See also R.A. Earnhardt Textile Mach. Div., Inc. v. South Carolina Ins. Co.*, 277 S.C. 88, 282 S.E.2d 856 (1981) (claim of knowing and willful misrepresentation not covered by policy limiting "occurrence" to injury or damage "neither expected or intended from the standpoint of the insured.")

Ordinarily, 'accident' would exclude an event caused by negligence or nuisance alone and followed by a foreseeable or natural consequence, for then neither the cause nor the effect is unexpectable. *See Hutchinson Water Co. v. United States Fidelity & Guaranty Co.*, 250 F.2d 892, 893 (10th Cir.1957). However, the object and terms of the instant insurance policy, we think, require the conclusion that if the negligence or nuisance is accompanied by an unintended and unexpectable factor effectively contributing to the cause or consequence of the incident, then the incident can be an accident within the policy coverage.

This is essentially the concept of an accident adopted by the Supreme Court of South Carolina. *Ducker v. Central Surety & Ins. Corp.*, 234 S.C. 228, 107 S.E.2d 342 (1959). As our definition of 'accident' is applicable to both the cause and consequence constituting the occurrence, we have no reason to consider them separately, for the policy in suit is not phrased with any such distinction and the South Carolina decisions permit none. *Goethe v. New York Life Ins. Co.*, 183 S.C. 199, 190 S.E. 451 (1937) ...

*Baker, supra*, at 750–51 (citations partially omitted).

In *Baker*, the court held that an insurer had a duty to defend suits against insureds

who were charged with willfulness in clearing a tract of land for construction of shopping center, negligence, and maintenance of a nuisance resulting in damage to surrounding property owners from water run off. The facts of the case show that during the work on the tract, unusually heavy rain fell for an extended period of time. In addition, two hurricanes brought additional rain. "The Weather Bureau reported that the rainfall for the four months was without precedent since the beginning of its records in 1887." 324 F.2d at 749.

> So great was the volume of rain water that chunks of asphalt street pavement were forced out of place and blocked the storm sewers. Heavy washes of water, mud and debris swept the street. The side ditches, intended to relieve the sewers of surface water, became clogged and caused the water from the construction area to overflow abutting residential properties. These were thus inundated repeatedly, beginning in July, throughout the ensuing four months.

*Id.* at 749–750.

Colonial has pointed to no unintended and unexpectable factors such as those occurring in *Baker* which effectively contributed to the harm suffered by Parker White. The fact that White suffered depression, an exacerbation of his alcoholism, and impotency, in no way diminishes the fact that Colonial intended him harm. Carried to its logical extent, Colonial's argument would mean an ax wielding insured who intended to cut off a victim's right arm but cut off the left would have coverage under Hartford's GCL policy be-

cause the left arm harm was not intended. Hartford's policy does not admit either of this construction or the one advanced by Colonial.

The court concludes that under South Carolina law, it is not necessary for Hartford to demonstrate that Colonial intended the *specific* damage of depression, alcoholism, and impotency to Parker White, only that Home intended to cause Parker White harm by its actions. Accordingly, the court concludes that the intentional act exclusion applies and that Hartford's policies extended to Colonial no coverage for Parker White's claims.[18] Hartford had no duty to indemnify Colonial in the Parker White litigation.

> "[A]n accident is never present when a deliberate act is performed unless some additional unexpected, independent and unforeseen [circumstance exists or] happening occurs which produces or brings about the result of injury or death." *Nor can an insured's intentional act be an accidental cause of injury when it is so inherently injurious that it cannot be performed without causing the resulting injury.*

*Harvey,* 498 S.E.2d at 227, *quoting with approval Vermont Mut. Ins. Co. v. Malcolm,* 128 N.H. 521, 523–24, 517 A.2d 800, 802 (1986) (citation omitted and emphasis added).

## CONCLUSION

Previously, the court has entered an order granting summary judgment. Accordingly, for the reasons as stated in this memorandum opinion, it is

---

**18.** It is clear that under South Carolina law the tort of outage is an intentional tort and is thus excluded from coverage under the policies. *See Snakenberg v. Hartford Cas. Ins. Co., Inc.,* 299 S.C. 164, 383 S.E.2d 2, 4 (1989). Finally, Colonial argues in its trial brief that White's contract claims were covered because "nothing in the Hartford policies ... exclude[s] coverage what a breach of

contract causes an unexpected bodily injury." This claim lacks merit. Parker White's breach of contract claim relies exclusively on intentional acts. On that basis alone, these claims contract claims are excluded from coverage under the policies. In addition, the same analysis contained in this opinion regarding the intentional act exclusion applies here with equal force.

ORDERED that this case be and is hereby DISMISSED with prejudice and that all pending deadlines are terminated and all pending motions are hereby DENIED as moot.

A separate final judgment will be entered.

## FINAL JUDGMENT

In accordance with the prior orders of the court and the memorandum opinion entered contemporaneously with this final judgment, it is

ORDERED and ADJUDGED that this case be and is hereby DISMISSED with prejudice. It is further

ORDERED that the costs of this proceeding be and are hereby taxed against the plaintiffs for which execution may issue.